

KYH/AL: USAO#2024R00416

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | <u>**UNDER SEAL**</u> |
| v. | CRIMINAL NO. RDB-25-048 |
| **ANTHONY CALVIN KNIGHT** <br> a/k/a "**RECK GOON**", | (Conspiracy to Engage in an Animal Fighting Venture, 18 U.S.C. § 371; Possession of a Firearm and Ammunition by a Prohibited Person, 18 U.S.C. § 922(g); Forfeiture, 7 U.S.C. § 2156(e), 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 924(d), and 28 U.S.C. § 2461(c)) |
| **Defendant.** | |



### SUPERSEDING INFORMATION

**COUNT ONE**
(Conspiracy to Engage in an Animal Fighting Venture)

The United States Attorney for the District of Maryland charges that:

**INTRODUCTION**

At all times relevant to this Superseding Information:

A. <u>Animal Fighting Ventures and Dogfighting</u>

1. In the United States, dogfighting ventures almost always involve "pit bull"-type dogs, which dogfighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. Generally, a dogfight occurs when two dogs are released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

2.      Because of their conditioning and training, dogs used in animal fighting ventures are almost always housed separately from other dogs—in pens, cages, or on chains—so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs used for fighting purposes to develop neck strength.

3.      Generally, dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes. Dogfighters generally keep such dogs solely for fighting purposes.

4.      Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dogfights are commonly found on the face and front legs, as well as on hind ends and thighs.

5.      Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

6.      Once a dogfighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then typically undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including treadmills used to run and exercise the dogs away from public view; weight pulls used to increase the dog's strength and stamina; devices such as "spring

poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs, vitamins, and other medicine. Some of the drugs used include steroids to build muscle mass and aggression. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dogfighter's "yard" or indoors away from public view.

7. Generally, dogfighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. Individuals who own fighting dogs often try to maintain records of their dogs' success in fighting, at least partly because the offspring of fighting dogs can be sold at higher prices based on the documented success of the parents. One website on which dogfighters post pedigrees to demonstrate the fighting lineage of their dogs is https://www.apbt.online-pedigrees.com/. On this site, pedigrees are searchable by a variety of parameters and are routinely marked with codes to signify dogs' fighting results, such as "1XW," "2XW," "CH.," and "GR. CH.," which signify a one-time dog-fight winner, a two-time dog-fight winner, a champion, and a grand champion, respectively. "OTC" refers to fights that were conducted "off-the-chain"—that is to say, a less formal fight, conducted without the prior preparation of a "keep." "GIS" refers to an award for the most "game" dog in a particular card of dogfights.

B. The "DMV Board" or "The Board," and "Reck Goon"

8. It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to sponsor that dog in a fight at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dogfighters rely heavily on each other, and extensive networks of contacts, to "call out a weight" and find a match. Dogfighters

often call out a weight to other known dogfighters in several states to increase their odds of finding a match. This is often done over the internet.

9. To maintain contact with each other to discuss dogfighting, to exchange photos and videos about dogfighting, dogfighters in the area of the District of Columbia, Maryland, and Virginia created private groups on the Telegram messaging application that they generally referred to as "The DMV Board" or "The Board." Those groups had as many as 28 members at one time, which included several now-convicted dogfighters.

10. The following co-conspirators—all of whom have been charged with, and most of whom have been convicted of, animal fighting offenses—were members of, or otherwise associated with, the DMV Board:

| Name | Alias(es) | Hereinafter |
|---|---|---|
| Bashawn Allen | 425 | Allen |
| Larry Alston | Big Goon | Alston |
| Charles Edward Davis, Jr. | Cat Daddy, Deep in the Game | Davis |
| Eldridge Jermaine Jackson | Big Head, 4b | Eldridge Jackson |
| Frederick Moorefield | Geehad | Moorefield |
| Mario Flythe | Razor Sharp | Flythe |
| Shaborn Nesbitt | Shy, CDK, The God I Am, Mike Honcho | Nesbitt |
| Dandre Patrick Wallace | Abstract | Wallace |
| Tarry Wilson | TJ, City Limits | Wilson |

**MANNER AND MEANS OF THE CONSPIRACY**

Among the manner and means by which the Defendant and others conducted and participated in the conspiracy were the following:

11. Members of the conspiracy trained and used pit bull-type dogs for dogfights.

12. Members of the conspiracy kept at their properties and trained fighting dogs owned by themselves as well as by other conspirators.

13. Members of the conspiracy traveled to dog fights held at locations owned and/or arranged by themselves and other conspirators.

14. Members of the conspiracy exchanged information about wagers and placed wagers on dogfights in which were entered dogs bred, trained, or owned by themselves and by other conspirators.

15. Members of the conspiracy used cell phones and direct messages to discuss dogfights, dogfighting, breeding fighting dogs, training techniques to maximize their chances of developing champion fighting dogs, and methods to avoid being caught by law enforcement.

16. Members of the conspiracy further used the Telegram and WhatsApp messaging applications to discuss training fighting dogs, buy and sell veterinary supplies for use on fighting dogs, exchange videos about dogfighting, arrange and coordinate dogfights, and exchange information about wagers on dogfights, away from the view of law enforcement authorities.

17. Members of the conspiracy used the names of their dogfighting operations and/or kennels to refer to themselves as well as to their dogfighting operations and/or kennels.

18. Members of the conspiracy used the Telegram and WhatsApp messaging applications to circulate media reports about dogfighters who had been caught by law enforcement and to discuss methods to minimize the likelihood that they would be caught themselves.

**OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY**

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, in the District of Maryland and elsewhere, the Defendant and his co-conspirators committed overt acts, including but not limited to the following:

19. On or about March 30, 2008, a conspirator posted to a website tracking pedigrees of fighting dogs a photo and information for the fighting dog "CH. THA GOONS MIKEY," owned in part by **KNIGHT**.

20. On or about July 21, 2009, a conspirator posted to a website tracking pedigrees of fighting dogs a photo and information for the fighting dog "Tha Goons Trick Daddy," owned in part by **KNIGHT**.

21. On or about April 30, 2017, **KNIGHT** and co-conspirator Allen entered their dogs into fights on the same card. In one fight, "Tha Goon's" dog, "Ms. Flex," fought "Ruby," a dog belonging to an unindicted co-conspirator.

22. On or about May 11, 2017, on the DMV Board, **KNIGHT** solicited a fight for a 35-pound dog for $1,500.

23. On or about June 4, 2017, on the DMV Board, **KNIGHT** posted to the DMV Board a link on a website containing information for fighting dogs to information about his fighting dog "CH THA GOONS MIKEY."

24. On or about June 12, 2017, co-conspirator Alston, a/k/a "Big Goon," posted on the DMV Board a list of members of "Tha Goons" kennel, including "Da Goons, Big Goon, Reck Goons, SGoon, and D Goon."

25. On or about July 7, 2017, **KNIGHT** posted to the DMV Board the news that, after a fight that lasted two hours, his dog "Chyna" defeated a dog that was the offspring of a champion fighting dog.

26. On or about July 8, 2017, **KNIGHT** posted to the DMV Board a link to a website tracking pedigrees of fighting dogs, specifically to a page showing information about his dog "Tha

Goons Ruby," last modified in 2009, with the statement that a fight of the dog "Ruby" was the first fight defendant **KNIGHT** did, "[i]nto chinese mike with a dog he got from baltimore chuck."

27. On or about July 24, 2017, **KNIGHT** posted to the DMV Board the statement "What's up my g's goons on deck."

28. On or about August 22, 2018, **KNIGHT** sent a private Instagram message to a fellow dogfighter soliciting a fight between their dogs. Immediately after soliciting the fight, **KNIGHT** said that the conversation should continue over the Telegram messaging application.

29. On or about February 24, 2020, co-conspirator Davis refereed a fight between a dog partially owned by co-conspirator Jackson and a dog partially owned by **KNIGHT**.

30. On or about February 25, 2020, **KNIGHT** posted on the DMV Board solicitations for fights for a 30-pound female dog for $2,500, a 41-pound male dog for $2,000, and a 38-pound male dog for $1,500.

31. On or about March 11, 2020, **KNIGHT** posted on the DMV Board solicitations for fights for a 33-pound male dog and a 27-pound female dog for $7,500 to $10,000.

32. On or about March 27, 2020, **KNIGHT** posted on the DMV Board a solicitation for a fight for a 51-pound male dog for $1,500.

33. On or about April 14, 2020, **KNIGHT** posted on the DMV Board a solicitation for a fight for a 34 or 35-pound female dog for $5,000.

34. On or about April 19, 2020, **KNIGHT** sent a video of his two pit bull-type dogs to the DMV Board.

35. On or about May 17, 2020, co-conspirator Wilson posted to the DMV Board a narrative of a fight, lasting one hour and 17 minutes, between "Peaches" (owned by co-conspirator Wallace) and "Cardi B" (owned in part by **KNIGHT**).

36. On or about May 19, 2020, a conspirator posted to a website tracking pedigrees of fighting dogs a photo and information for the fighting dog "Abstract's Baby O (AKA Peaches) 1XW," owned by co-conspirator Wallace with a reference to the one hour and 17 minute duration of the fight two days earlier against "Cardi B," the dog owned in part by **KNIGHT**.

37. On or about July 7, 2020, **KNIGHT** sent a video of his pit bull-type dog to the DMV Board.

38. On or about July 28, 2020, **KNIGHT** posted on the DMV Board solicitations for fights for a 42-pound male dog, a 35-pound male dog, and a 34-pound female dog.

39. On or about July 29, 2020, **KNIGHT** posted on the DMV Board that he arranged a spot for dog fights to be conducted on Saturday night. **KNIGHT** wanted to know who would be attending and what the weights of the dogs would be, "so we can get everybody matched up."

40. On or about October 11, 2020, co-conspirator Moorefield, a/k/a "Geehad," texted a fellow dogfighter a narrative of a fight in which "G-Code Kennel's Crash," a 42-pound dog belonging to an unindicted co-conspirator, lost a fight to "Nino," a dog belonging to **KNIGHT** and co-conspirator Alston.

41. On or about December 3, 2020, **KNIGHT** sent private Instagram messages to a fellow dogfighter discussing a 42-pound male dog. One of the messages was an audio file in which **KNIGHT** discussed obtaining the dog "as a matchdog" and stating that the dog's son had made "Champion" status a few weeks prior.

42. On or about March 27, 2021, **KNIGHT** made a Facebook post advertising a dog "[o]pen for stud" for a $500 payment. **KNIGHT** stated that "I wish not to register my dogs personal preference" and that this dog was "throwing hot pups very athletic high strung."

KNIGHT also linked to a website tracking pedigrees of fighting dogs with information for the fighting dog "Flocka's & JP Iceberg Slim."

43. On or about June 13, 2021, a conspirator posted to the DMV Board a narrative of a fight involving "Amber," a dog owned in part by **KNIGHT**.

44. On or about July 18, 2021, a conspirator posted to the DMV Board a narrative of a fight involving "Firebitch 1XW," a 30-pound dog owned in part by **KNIGHT**.

45. On or about July 30, 2021, **KNIGHT** commented on a Facebook post stating that he had a female dog for sale for $1,000. The comment contained a link to a website tracking pedigrees for fighting dogs with information for the fighting dog "True Gold."

46. On or about August 10, 2021, a conspirator posted to the DMV Board a narrative of a fight involving "Amber," a 33-pound dog owned in part by **KNIGHT**.

47. On or about September 6, 2021, a conspirator posted a modification to information on a website tracking pedigrees of fighting dogs for the fighting dog "425 Money Boy$ Hustle 2X," owned by co-conspirator Allen, characterizing the dog as having defeated "Amber Rose," a dog owned in part by **KNIGHT**.

48. On or about November 14, 2021, a conspirator posted to a website tracking pedigrees of fighting dogs information for the fighting dog "Goon Family's Ms Brown 2X," owned in part by **KNIGHT**, characterizing the dog as the offspring of "4B's Lil Sinner" and "4B's Justice" (fighting dogs owned by co-conspirator Jackson and a descendant of "City Limits (P-Roads) Buckshot 1XDGL," a fighting dog owned by co-conspirator Wilson).

49. On or about April 15, 2023, a conspirator posted to a website tracking pedigrees of fighting dogs a photo and information for the fighting dog "Tha Goons Penny Wise 1X," owned in part by **KNIGHT**.

50.     On or about April 28, 2023, **KNIGHT** sent a message to co-conspirator Flythe in which he solicited Flythe to "get ya weights together" for a prospective fight.

51.     On or about December 17, 2024, **KNIGHT** was in possession of several cages consistent with kennels used to house fighting dogs, located in the back yard and the garage of his residence in Hedgesville, West Virginia.

52.     On or around December 17, 2024, **KNIGHT** was in possession of the following items consistent with engaging in dogfighting: a stand used to forcibly breed fighting dogs, multiple treadmills of the make and size used to train fighting dogs, a weighted collar, a ball-and-string training aid similar to a "flirt pole," and veterinary medicines.

## THE CHARGES

53.     From in or around March 2008 and continuing until the present, in the District of Maryland and elsewhere, the Defendant,

**ANTHONY CALVIN KNIGHT, a/k/a "RECK GOON",**

did knowingly and unlawfully conspire with Moorefield, Flythe, Alston, and others, known and unknown, to commit the following offenses:

a. To sponsor and exhibit dogs in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(a) and Title 18, United States Code, Section 49(a);

b. To sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(b) and Title 18, United States Code, Section 49(a);

c. To use instrumentalities of interstate commerce for commercial speech for the purposes of advertising animals for use in animal fighting ventures, promoting, and in other manners

furthering animal fighting ventures, in violation of Title 7, United States Code, Section 2156(c) and Title 18, United States Code, Section 49(a); and

d. To use a facility in interstate commerce, namely the internet, Telegram, and other text- and instant-messaging applications, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, a business enterprise involving gambling in violation of the laws of Maryland and of the United States, in violation of Title 18, United States Code, Section 1952(a)(3).

18 U.S.C. § 371

## COUNT TWO
### (Possession of a Firearm and Ammunition by a Prohibited Person)

The United States Attorney for the District of Maryland further charges that:

On or about December 17, 2024, in the Northern District of West Virginia, the Defendant,

**ANTHONY CALVIN KNIGHT, a/k/a "RECK GOON",**

knowing he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit: a 10mm Auto Glock, Model 29 Gen 4, handgun bearing serial number YNG138, approximately 64 rounds of 10mm ammunition, and approximately 147 rounds of 9mm ammunition, and the firearm and ammunition were in and affecting commerce.

18 U.S.C. § 922(g)

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further charges that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the Defendant that the United States will seek forfeiture as part of any sentence in accordance with 7 U.S.C. § 2156(e), 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 924(d), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the Defendant's conviction under Counts One and Two of this Superseding Information.

### Animal Fighting Venture Forfeiture

2. Upon conviction of the offense alleged in Count One of this Superseding Information, the Defendant,

**ANTHONY CALVIN KNIGHT, a/k/a "RECK GOON",**

shall forfeit to the United States, pursuant to 7 U.S.C. § 2156(e) and 28 U.S.C. § 2461(c), any animal(s), as defined in 7 U.S.C. § 2156(f)(4), involved in such offense.

### Travel Act Forfeiture

3. Upon conviction of the offense alleged in Count One of this Superseding Information, the Defendant,

**ANTHONY CALVIN KNIGHT, a/k/a "RECK GOON",**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

### Firearms and Ammunition Forfeiture

4. Upon conviction of the offense alleged in Count Two of this Superseding Information, the Defendant,

ANTHONY CALVIN KNIGHT, a/k/a "RECK GOON",

shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), any firearms and ammunition involved in such offense.

## Property Subject to Forfeiture

5. The property subject to forfeiture includes, but is not limited to:

    a. a 10mm Auto Glock, Model 29 Gen 4, handgun bearing serial number YNG138;

    b. approximately fifty (50) loose rounds of 10mm ammunition;

    c. approximately one-hundred forty-one (141) loose rounds of 9mm ammunition;

    d. a magazine containing approximately fourteen (14) rounds of 10mm ammunition; and

    e. a magazine containing approximately six (6) rounds of 9mm ammunition.

## Substitute Assets

6. If, as a result of any act or omission of the Defendant, any of the property described above as being subject to forfeiture):

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

7 U.S.C. § 2156(e)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 924(d)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Kelly O. Hayes /APL*
Kelly O. Hayes
United States Attorney

15